### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

MARGARET J. BURMAN,

                *Plaintiff,*

      v.

CITIBANK, N.A.,

                *Defendant.*

Civil Action No.: _____

**COMPLAINT**

MARGARET J. BURMAN, Plaintiff herein, by her undersigned attorneys, Schlanger Law Group LLP, alleges and complains of Defendant Citibank N.A., as follows:

### PRELIMINARY STATEMENT

1.     MARGARET J. BURMAN ("Plaintiff" or "Mrs. Burman") is an elderly victim of a sinister identity theft, fraud, computer hacking and extortion scam.

2.     The perpetrators, who are unknown to Mrs. Burman, wreaked havoc on her finances and retirement savings by, among other things, unlawfully and fraudulently intercepting her bank account information and unlawfully transferring funds from Mrs. Burman's bank account to unknown accounts and racking up unauthorized credit card charges.

3.     Mrs. Burman promptly and repeatedly disputed the charges with CITIBANK, N.A. ("Defendant" or "Citibank") and provided Citibank with a police report regarding the thefts.

4.     Without legitimate basis, Citibank refused to credit Mrs. Burman's accounts for the stolen funds and unauthorized credit card charges as required by law.

5.     Plaintiff brings claims against Citibank for violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, the Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666

*et seq.*, the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* and New York General Business Practice § 349 ("NYGBL § 349").

## JURISDICTION AND VENUE

6.      The Court has jurisdiction pursuant to 15 U.S.C. § 1693m(g), 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331.

7.      Supplemental jurisdiction exists for the state law claim pursuant to 28 U.S.C. § 1367.

8.      Jurisdiction over Plaintiff's claim for declaratory relief is conferred by 28 U.S.C. § 2201.

9.      Venue is proper in this District because Plaintiff resides in this District, a substantial part of the events and occurrences underlying this litigation occurred within this District, and Defendant regularly conducts business here.

## PARTIES

10.     Plaintiff Margaret J. Burman is a natural person and citizen of New York residing in New York, New York.

11.     Mrs. Burman is a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6) and TILA, 15 U.S.C. § 1602(i).   Her checking, savings and credit card accounts with Citibank were used for personal, family, or household purposes.

12.     Defendant Citibank, N.A. is a national banking association formed under the laws of the United States and was, at all times relevant to this Complaint, a financial institution as defined by the EFTA, 15 U.S.C. § 1693a(9), and a "creditor" as defined by 15 U.S.C. §1602(g).

## FACTS

**A.**        **The Criminal Scheme**

13.     Mrs. Burman is a victim of theft.

14.     In or about February 2020, Mrs. Burman was contacted online by criminal internet scammers (the "Fraudsters") "spoofing" or impersonating a fake company that provides "tech support" for Apple computers.

15.     The Fraudsters sent Mrs. Burman a message online about renewing an annual service contract for her Apple desktop computer at the price of $1,200 - $1,600.  The Fraudsters' message directed Mrs. Burman to call a phone number if she wanted to cancel the purported contract and receive a refund.

16.     Of course, Mrs. Burman never signed up for any such contract in the first place and no such contract exists, but confused, concerned and unable to recall whether she was charged for unsolicited tech support services, Mrs. Burman responded to the Fraudsters' message.

17.     The Fraudsters told Mrs. Burman they could not refund the entire amount of the service contract because the company had already serviced her computer and instead offered to issue Mrs. Burman a $500 refund directly to her Citibank checking account.

18.     The Fraudsters told Mrs. Burman the $500 refund would be transferred from the company's Chase bank account to Mrs. Burman's Citibank checking account.

19.     In order to effectuate the refund, the Fraudsters told Mrs. Burman they needed to access her computer.

20.     Through this subterfuge, the Fraudsters installed remote access software on Mrs. Burman's Apple desktop computer and infected it with other malware without her knowledge or consent, which, among other things, allowed them to monitor Mrs. Burman's computer use and manipulate her account balance displays on her computer.

21.     Having compromised Mrs. Burman's computer with malware, the Fraudsters gained unauthorized access to her personal checking, savings, credit card and other accounts with

Citibank, which was made available by Citibank without the knowledge, consent, or prior authorization of Mrs. Burman.

22.     The Fraudsters purported to show Mrs. Burman the Chase account where the $500 refund would be transferred from, which included a fabricated Chase logo to give the appearance of legitimacy.

23.     On or about February 27, 2020, the Fraudsters initiated a $50,000.00 transfer from Mrs. Burman's Citibank savings account to her Citibank checking account and subsequently tricked her into believing she was over-refunded for the fictitious tech support contract by $49,500.00.

24.     The Fraudsters thereafter repeatedly contacted Mrs. Burman by telephone, became verbally abusive and threatening, gas lighted her by making her think she overcharged them and accused her of stealing their money.  The Fraudsters demanded Mrs. Burman "return" the money that she had been tricked into thinking was theirs, but which was actually transferred from her savings account to her checking account without her knowledge or consent.

25.     Deceived and fearful of her physical safety if she did not obey, Mrs. Burman complied with the Fraudsters' demands, which grew more and more exacting, extortive, and controlling as the scam continued.

26.     Ultimately, Mrs. Burman estimates at this time that the Fraudsters stole approximately $68,328.08 from her during their scheme.

27.     These thefts took the form of, inter alia, fraudulent wire transfers, unauthorized account transfers (including intra-bank transfers) unauthorized credit card charges and other serious criminal misconduct.

28.     On or about March 25, 2020 and numerous times thereafter, Mrs. Burman reported the fraud and thefts to Citibank.

29.     On or about March 30, 2020, Mrs. Burman filed a police report with the NYPD regarding the criminal scheme and thefts.

30.     On or about May 31, 2020, the NYPD executed a formal police report regarding the thefts.

31.     On or about March 30, 2020, Mrs. Burman filed a complaint with State of New York Attorney General (Elderly Services).

32.     On or about March 30, 2020, Mrs. Burman filed a complaint with the New York City Department of Aging, Elderly Crime Legal Services.

33.     On or about March 30, 2020, Mrs. Burman contacted the FBI regarding the thefts.

34.     On or about April 11, 2020 and May 1, 2020, Mrs. Burman filed complaints with the Consumer Financial Protection Bureau.

35.     To date, Citibank has refused to refund Mrs. Burman for the thefts from her bank accounts.

**B.          The Fraudulent Transfers**

36.     On or about March 13, 2020, the Fraudsters used Mrs. Burman's Citibank "Citi ThankYou® Preferred" credit card (acct number ending in 5723) without her knowledge or authorization to obtain a cash advance of $1,000.00.

37.      Also, on or about on or about March 13, 2020, the Fraudsters used Mrs. Burman's "Citi ThankYou® Preferred" credit card (acct number ending in 6395) without her knowledge or authorization to obtain a cash advance of $7,000.00.  (The $1,000 cash advance and $7,000 cash advance are referred to together as the "Unauthorized Cash Advances".)

38.     The Fraudsters subsequently transferred the Unauthorized Cash Advances to Mrs. Burman's Citibank personal checking account and then immediately withdrew the money.

39.     On March 25, 2020, Mrs. Burman closed the two "Citi ThankYou® Preferred" credit cards which were used by the Fraudsters to obtain the Unauthorized Cash Advances.

40.     On March 27, 2020, Mrs. Burman disputed the Unauthorized Cash Advances, plus cash advance fees and charged interest with Citibank.

41.     On March 28, 2020, Mrs. Burman requested Citibank place a note on her account that no new accounts of any kind were to be opened in her name unless Mrs. Burman was physically present at her local Citibank branch office and working through her banking relationship manager, Tracy Valle.

42.     During Mrs. Burman's discussions with Citibank on March 28, 2020, Citibank employee and private wealth representative Raibely Gonell confirmed to Mrs. Burman her funds were insured by the FDIC and assured her that all the money the Fraudsters stole from her would be credited back to her accounts within 45 days.  Ms. Gonell further advised she would send an email to Mrs. Burman's relationship manager to brief her regarding the thefts from Mrs. Burman's accounts.

43.     During a phone call on April 8, 2020, a Citibank Security Operations investigator, Bella Walker, informed Mrs. Burman that the result of the investigation into the Unauthorized Cash Advances was to have Mrs. Burman return the money from her checking account to pay off the cash advances notwithstanding the fact that the money had already been stolen.

44.     On April 10, 2020, Mrs. Burman sent a dispute letter to Citibank addressed to the branch manager at her local Citibank branch, and sent copies of said letter to her Citibank account

relationship manager, the NYPD detective assigned to her case and Mark Carawan, Citibank's Chief Compliance Officer.

45.     On April 20, 2020, Mrs. Burman sent another dispute letter to Citibank via certified mail to the billing dispute PO Box address in South Dakota listed on her statements and Citibank Client Services in San Antonio and via email to the branch manager at her local Citibank branch. Mrs. Burman sent copies of said letter to her Citibank account relationship manager, the NYPD detective assigned to her case and Mark Carawan, Citibank's Chief Compliance Officer.

46.     On April 20, 2020, Citibank issued a $1,000.00 "Security credit" to Mrs. Burman's account, which was reversed on April 22, 2020.

47.     By letter dated April 24, 2020, Citibank's "Executive Response Unit" denied Mrs. Burman's claim of identity theft and refused to credit her accounts for the Unauthorized Cash Advances.  Citibank's April 24th letter stated that Citibank "regrets[s] that the $1,000.00 [Security credit] was inadvertently reissued on April 20, 2020" and "reversed on April 22, 2020."

48.     Citibank's April 24, 2020 letter further stated Citibank may report her account as "past due" to consumer reporting agencies if it does not receive the minimum payment by the due date shown on Mrs. Burman's billing statement.

49.     On May 1, 2020 and May 21, 2020, Mrs. Burman again disputed the Unauthorized Cash Advances with Citibank.

50.     To date, Citibank has refused to credit Mrs. Burman for the Unauthorized Cash Advances.

51.     Citibank's refusal to credit Mrs. Burman for the Unauthorized Cash Advances and Unauthorized Charges and its other misconduct as set forth herein has caused her immense mental anguish, anxiety, stress, shame, humiliation, sleeplessness, and other pain and suffering.

**C.**     **The Unauthorized Credit Card Charges**

52.     On or about February 24, 2020, Mrs. Burman's Citibank "Citi ThankYou® Preferred" credit card (acct number ending in 5723) was charged without her knowledge or authorization to make a purchase at "NADSMARKETING.COM" for $499.99.

53.     On or about March 2, 2020, Mrs. Burman's Citibank "Citi ThankYou® Preferred" credit card (acct number ending in 5723) was charged without her knowledge or authorization to make a purchase at "SOUTHERNWEBCARE.COM" for $449.99. (The $499.99 charge and $449.99 charge are referred to together as the "Unauthorized Charges".)

54.     Mrs. Burman disputed the Unauthorized Charges with Citibank on April 10, 2020.

55.     On April 29, 2020, Mrs. Burman received a letter from Citibank, dated April 15, 2020, regarding the $499.99 dispute with "NADSMARKETING.COM".  Citibank's April 15th letter asked Mrs. Burman to state whether the charge was authorized and to sign and return the requested information to Citibank by April 25, 2020.

56.     Mrs. Burman checked the following statement on Citibank's April 15, 2020 letter: "Neither I, nor anyone authorized by me, made this transaction or received any benefit. The signature(s) provided are not mine." Mrs. Burman signed, dated and returned the information requested in Citibank's April 15, 2020 letter to Citibank on April 30, 2020.

57.     By letter dated April 24, 2020, Citibank's "Executive Response Unit" responded to Mrs. Burman's dispute, but failed to credit her for the Unauthorized Charges and further misidentified the credit card account to which the charges were made.

58.     By letter dated May 6, 2020, regarding the $449.99 dispute with "SOUTHERNWEBCARE.COM", Citibank asked Mrs. Burman to state whether the charge was authorized and to sign and return the requested information to Citibank by May 15, 2020.

59.     Mrs. Burman checked the following statement on Citibank's May 6, 2020 letter: "Neither I, nor anyone allowed to use this account, made or recognize this transaction." Mrs. Burman signed, dated and returned the information requested in Citibank's May 6, 2020 letter to Citibank on May 13, 2020.

60.     On June 2, 2020, Mrs. Burman sent an email to Citibank disputing the Unauthorized Charges and resending her attestations that the charges were fraudulent.

61.     To date, Citibank has refused to credit Mrs. Burman for the Unauthorized Charges and has informed Mrs. Burman it is holding her responsible for the Unauthorized Charges.

62.     Citibank's refusal to credit Mrs. Burman for the Unauthorized Cash Advances and Unauthorized Charges and its other misconduct as set forth herein has caused her immense mental anguish, anxiety, stress, shame, humiliation, sleeplessness, and other pain and suffering.

### FIRST CLAIM FOR RELIEF
**(Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq.*)**

63.     Plaintiff repeats and re-alleges each of the foregoing paragraphs of this Complaint as if fully set forth herein.

64.     Per the EFTA, Regulation E, and Regulation E's Official Interpretations, Defendant bears the responsibility for unauthorized transfers and withdrawals like the present ones.

65.     The EFTA caps consumer liability for unauthorized electronic fund transfers at $50 and the transactions at issue exceed that amount.  15 U.S.C. § 1693g(a).

66.     Defendant has violated the EFTA by attempting to hold Plaintiff liable for unauthorized transfers, in violation of the EFTA's sharp limitations on consumer liability.

67.     Moreover, once Plaintiff notified Defendant that she disputed the unauthorized withdrawals, Defendant was required to conduct a bona fide reasonable investigation to determine if fraud occurred.

68.     However, Defendant failed to conduct a reasonable investigation.

69.     A reasonable investigation would have included review of one or more of the following items, which would have led Defendant to conclude that fraud had occurred and would have revealed, inter alia, the following:

    a.  Plaintiff did not authorize the disputed transactions;

    b.  Plaintiff promptly reported the fraudulent transactions;

    c.  Plaintiff has no history of making false or unverifiable fraud reports;

    d.  Plaintiff has no criminal history;

    e.  Plaintiff has no history of irresponsible use of her account;

    f.  Plaintiff has no history of frauds with Citibank or any other financial institution;

    g.  No other proof exists to refute Plaintiff's claims;

    h.  Documentation or written signed statements provided by the Plaintiff;

    i.  Historical information on the Plaintiff's pattern of use (e.g. time, frequency, location, and types and amounts of transactions);

    j.  Plaintiff's location at the time of the unauthorized transactions; and

    k.  Police reports.

70.     Furthermore, the EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them.  15 U.S.C. § 1693g(b).

71.     This burden of proof cannot be and was not plausibly met with regard to the contested transactions and Defendant could not have plausibly concluded that the transfers were authorized.

72.     In short, any reasonable investigation of these transactions would have resulted in Defendant's cancelling the stolen debit card and crediting Plaintiff's account for the stolen funds.

73.     Defendant's acts and omissions set forth above constitute violations of the EFTA.

74.     As a direct and proximate result of Defendant's violations of the EFTA, Plaintiff is entitled to an award of statutory and actual damages as well as attorney's fees and costs.

75.     Defendant did not conduct a good faith investigation regarding the stolen funds.

76.     Defendant did not have a reasonable basis for believing the account was not in error.

77.     Defendant willfully concluded that Plaintiff's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to Defendant at the time of the investigation.

78.     In light of the foregoing – in addition to all other relief sought herein –  Plaintiff is also entitled to recover treble damages under Section 1693f(e).

## SECOND CLAIM FOR RELIEF
### (Fair Credit Billing Act, 15 U.S.C. § 1666, *et seq.*)

79.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

80.     Plaintiff, a victim of identity theft and complex fraud, timely and repeatedly disputed the Unauthorized Cash Advances and Unauthorized Charges.

81.     Defendant violated the FCBA because its April 24, 2020 denial of Plaintiff's claim failed to "set[] forth . . . the reasons why the creditor believes the account of the obligor was correctly shown in the statement." 15 U.S.C. § 1666(a)(3)(B)(ii).

82.     Defendant also violated the FCBA because the error alleged by Plaintiff related to "goods not delivered to the obligor" but Defendant made no determination that "such goods were actually delivered, mailed, or otherwise sent to the obligor" and did not provide "the obligor with a statement of such determination."  15 U.S.C. § 1666(a)(3)(B)(ii).

83.     Defendant also violated the FCBA by failing to conduct a reasonable investigation of the Unauthorized Cash Advances and Unauthorized Charges on Plaintiff's credit card accounts.

84.     A reasonable investigation would have found that Plaintiff's years-long purchasing history is inconsistent with the Unauthorized Cash Advances and Unauthorized Charges.

85.     A reasonable investigation would likewise have found that Plaintiff did not ever use her credit card to take out cash advances historically or in this instance.

86.     A reasonable investigation would likewise have found that Plaintiff does not shop or use the card at "NADSMARKETING.COM" or "SOUTHERNWEBCARE.COM", where the Unauthorized Charges were incurred.

87.     Defendant never requested information regarding Plaintiff's knowledge of who made the Unauthorized Cash Advances and withdrawals and Unauthorized Charges.

88.     In short, any reasonable investigation of these charges would have resulted in their permanent removal from Plaintiff's account.

89.     Defendant's actions and omissions as set forth above constitute violations of the FCBA. These violations include, without limitation:

     a.     Unlawfully charging Plaintiff for transactions she never authorized;

     b.     Failing to adequately investigate the dispute and correct Plaintiff's bill by permanently reversing the charges related to the transactions.

     c.     Failing to send to Plaintiff a written explanation or clarification, setting forth the valid reasons why Defendant believes Plaintiff is liable for the disputed charges.

     d.     Failing to cease billing and collection activity upon notification by Plaintiff that the account was disputed.

90.     As a result of Defendant's violations of the FCBA, Plaintiff is entitled to actual damages, statutory damages, punitive damages, declaratory judgment that Defendant has violated the statute, costs, and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF
### (Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*)

91.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

92.     Pursuant to 15 U.S.C. § 1643, a "cardholder" such as Mrs. Burman is liable for the unauthorized use of a credit card only if, among other things, "the liability is not in excess of $50." 15 U.S.C. § 1643(a)(1)(B).

93.     The unauthorized charges to Mrs. Burman's cards, in the amount of $8,949.89, plus cash advance fees and charged interest, exceed $50.

94.     Even though Mrs. Burman is not liable for the unauthorized charges under 15 U.S.C. § 1643, Defendant has unlawfully attempted to hold Mrs. Burman responsible for the unauthorized charges plus associated fees in violation of TILA.

95.     As a result of Defendant's violation of TILA, Plaintiff is entitled to declaratory judgment, actual damages, statutory damages, punitive damages, costs, and reasonable attorneys' fees.

### FOURTH CLAIM FOR RELIEF
**(Deceptive Acts and Practices Unlawful, NYGBL § 349 *et seq.*)**

96.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

97.     In the course of its dealings with Plaintiff, Defendant has engaged in deceptive conduct in the conduct of business, trade, commerce or the furnishing of a service in this state and constituted a violation of §349 independent of whether Defendant's conduct violated any other law.

98.     Specifically, but without limitation, Defendant's deceptive conduct included:

   a.   Falsely alleging that it had performed a *bona fide* investigation into the fraudulent transactions; and

   b.   Falsely alleging that it had a basis to conclude that no fraud occurred.

   c.   Unlawfully charging Plaintiff for transactions she never authorized;

    d.   Failing to adequately investigate the dispute and correct Plaintiff's accounts by permanently reversing the unauthorized charges, while falsely claiming to have done an adequate investigation; and

    e.   Attempting to bill and collect on sums not owed (and regarding which any reasonable investigation would have determined were not owed).

99.    Defendant's conduct as alleged herein is "consumer oriented."

100.    Indeed, far from a "one shot transaction," Defendant deals with a large volume of customers who dispute unauthorized charges.

101.    Upon information and belief, Defendant's misconduct as set forth above is part of a recurring policy and practice of falsely alleging that it has performed *bona fide* investigations into fraudulent transactions and falsely alleging that it has a basis to conclude that no fraud has occurred on the accounts of those customers that submit disputes.

102.    These policies and practices have the potential to be repeated with regard to a large number of consumers.

103.    Each of these deceptive acts and practices is one that has a broad impact on consumers.

104.    Due to these violations of NYGBL § 349, Plaintiff has suffered actual damages and is entitled to actual damages, treble damages, punitive damages, declaratory judgment that Defendant has violated the statute, injunctive relief barring Defendant from henceforth committing the deceptive acts and practices set forth herein, costs and reasonable attorney's fees.

### FIFTH CLAIM FOR RELIEF
**(Declaratory Judgment)**

105.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

106.    Given Defendant's continued demand that Plaintiff pay the Unauthorized Charges, Defendant's conduct has created a real and reasonable apprehension of liability on Plaintiff's part.

107.    Defendant's conduct constitutes a course of conduct that has brought Plaintiff into adversarial conflict with Defendant.

108.    Plaintiff did not authorize the disputed transactions and therefore does not owe Defendant any money.

109.    Plaintiff is entitled to and hereby seeks a declaratory judgment that she is not liable for the charges in question.

**WHEREFORE,** Plaintiff Margaret J. Burman seeks judgment in her favor and damages against Defendant:

   A.    awarding Plaintiff actual damages, treble damages, statutory damages, punitive damages, costs, and reasonable attorneys' fees;

   B.    awarding Plaintiff injunctive relief;

   C.    entering a declaratory judgment that Plaintiff is not liable for the charges in question and Defendant's practices alleged herein are unlawful; and

   D.    such other and further relief as may be necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: March 15, 2021

*/s/Daniel A. Schlanger*
Daniel A. Schlanger
Schlanger Law Group LLP
80 Broad Street, Suite 1301
New York, NY 10004
T: 212-500-6114
F: 646-612-7996
E: dschlanger@consumerprotection.net

*Counsel for Plaintiff*
